Jamie Pizarro, Craig Smith v. The Home Depot, Inc., the Administrative Committee of the Home Depot Future Builder 401K Plan et al, 22-13643. Mr. Tracy, when you are ready, you may proceed. I see that you have reserved four minutes for rebuttal. Thank you, Your Honor. David Tracy for the Plaintiff's Appellants. For the Court's permission, I have requested four minutes for rebuttal. May it please the Court. The record in this case demonstrates genuine issues as to whether the Home Depot defendants breached the highest duties known to law, ERISA's fiduciary duties, by failing to monitor the fees and investments of one of the largest 401K plans in America. This appeal is about whether ERISA plans participants who are all current or former Home Depot employees and their beneficiaries get to put a trial. Below, the District Court found genuine disputes about whether defendants breached their duties on all plaintiff's claims except just one of the investments. Yet, the District Court nevertheless granted summary judgment for the defendants on all claims. In so ruling, the Court committed four key errors. First, as to the element of proximate causation, the District Court discounted hard facts and expert testimony, raising genuine disputes. Second, the Court incorrectly assumed that plaintiffs bore the burden on proximate causation and adopted a no-prudent fiduciary standard that required plaintiffs to prove a negative in order to prevail. Third, as to the Stevens Fund, the Court ignored evidence that defendants failed to diligently monitor the fund. Fourth, the Court held plaintiffs had waived all equitable relief, even though defendants never challenged plaintiffs' entitlement to such relief. In sum, the evidence shows genuine disputes of material fact about whether Home Depot mismanaged the fees and investments of a multi-billion dollar plan and caused devastating losses to the retirement savings of hundreds of thousands of workers. Counsel, I may have misunderstood you. Did you say the District Court erred in finding that the burden of proof on causation of loss was on the plaintiffs? That's right, Your Honor, on proximate causation. What do we do with the last paragraph of Willett? Your Honor, the last paragraph of Willett discusses plaintiffs' burden on their affirmative motion. It doesn't discuss what plaintiffs' burden would be at summary judgment on defendants' affirmative motion. It reaches the same conclusion, though. I mean, it's impossible to put the burden on one side for summary judgment and say there's a genuine issue of material fact and then flip it at trial where there won't be a genuine issue of material fact if the burden makes any difference. The whole point of summary judgment is to avoid needless trials. And if you say this is the standard for summary judgment and not this is the standard at trial, it screws up the whole system. Your Honor, the point we are trying to make is that at trial, once plaintiffs demonstrate a breach and a related loss, the burden would shift. But if the summary judgment motion is just on the element of proximate causation, then it is, as the second to last paragraph in Willett says, it would be defendants' burden to establish the absence of causation. If the defendant is trying to get a judgment at that stage, but they say on remand, this is the way it works. Your Honor, the sentence before, the court says on remand, it says, the court says, therefore, summary judgment in favor of plaintiffs on this issue is improper. And this should be resolved by the lower court on remand. And then it says, on remand, the burden of proof on the issue of causation will rest on the beneficiaries. But they're talking about plaintiffs' affirmative summary judgment motion. Do you know of any other context where the standard, the burden, is different at summary judgment? It lies on a different party than it does at trial? That is a pretty unique argument. Your Honor, we all, for instance, all affirmative defenses, the burden of summary judgment would lie on the party that's going to assert the affirmative defense. Right, but is this an affirmative defense? It's not. Your Honor, in effect, it is, right? In effect, it is because plaintiffs should demonstrate breach and a related loss. In effect, they're demonstrating breach and a resulting loss. And then the burden shifts to the defendant to say, well, the loss would have happened anyway. That's trust law's burden shifting framework. In effect, it serves the same purpose as an affirmative defense because the plaintiffs have shown breach of the law's highest duties. They've shown harm that directly came from, factually, resulted from breach of the law's highest duties. And then the defendant gets to come and say, well, I may have breached the law's highest duties, but no harm, no foul. And what the Eighth Circuit has said, citing the Second Circuit, is that courts don't take kindly to that argument. And traditionally, in trust law, courts did not take kindly to that argument. But doesn't that account, and trust law accounts for the lack of information often that plaintiffs have. And the entire ERISA scheme, that's not the only purpose of it, but it seems that a big part of ERISA was to shift that, an openness and transparency to give people like your clients more information. There is some disclosure and openness and transparency in ERISA, but it doesn't, what gets disclosed on a Form 5500 is very bare bones, right? What gets disclosed to the Department of Labor is very bare bones, gives you only a small sketch of what's actually happening. Burden shifting is not, as you also noted, is not only because of the informational asymmetries. The other policies behind it, which you'll find as traditional reasons for shifting the burden, includes the less likely contention. If you look at McCormick on evidence, which is cited by the Supreme Court in Schaeffer, you'll see the less likely contention is another traditional rationale for burden shifting. And here, courts have said, as Tatum said in the Fourth Circuit, that ERISA assumes that a breach will usually be followed by a loss. Now, occasionally, it may be that the fiduciary gets lucky and the breach isn't followed by a loss, but ERISA's structure, as the Fourth Circuit said, assumes generally breach is followed by loss. That is the least likely contention rationale for burden shifting, which you will find in McCormick. Additionally, you will find in McCormick the... So we send the case back, tell the district court, we know it's confusing, but follow the last sentence, paragraph of Willett and put the burden on the plaintiffs. And the record is made, it comes up, and the district court says, I've never seen this before outside the classroom, but the evidence is in equipoise. What the hades do I do now? If we're a tribe and plaintiffs have demonstrated breach and a related loss and the evidence is in equipoise on proximate causation, then plaintiffs win. Okay, so Willett means nothing. The last paragraph of Willett means nothing. The plaintiffs have the burden of proof, but if neither party has carried the persuasive burden and the evidence is in equipoise, the plaintiffs win. Now, tell me how that's different from the defendant having the burden. Because a summary judgment... The last paragraph of Willett... We get a summary judgment, we wash it out, they forgot to file, missed the deadline. We're at trial and we know from Willett that the burden of proof is on the plaintiffs. And it comes up 50.00 to 50.00 as determined by the district court. And you say that means that the plaintiffs win? Yes, Your Honor, because... And here's how I would square that with the last... What kind of burden is that? Your Honor... No, what does the word burden mean? Burden means if you don't carry it, you lose. Your Honor, the last paragraph of Willett says the burden on the issue of causation will rest with the beneficiaries. Here, what I'm saying is the concept of related loss. Plaintiffs have the burden of proving breach and a related loss. The concept of related loss means factual causation, factually results. Willett does not say proximate causation is necessarily... Or Willett doesn't describe the content of proximate causation. And the kind of proximate causation we're talking about here is the claim, no harm, no foul, that the fiduciary... Willett doesn't say that excludes that either. Right, Willett is silent on that. We don't know... Except it says the plaintiff has the burden. But it also says at summary judgment, it would be defendant's, which is where we are today, that it would be defendant's burden to establish the absence of causation by proving the claim losses could not have resulted from the breach. Yeah, in order to prevail at summary judgment at that stage. But on remand, the burden is on the plaintiffs, which means they lose if they don't carry the burden. I mean, what is the meaning of burden if the party with it doesn't lose unless he convinces it's more likely than not that he has shown what he must show? I agree that plaintiffs have a burden and a burden on some kind of causation. But the causation that the plaintiffs have the burden on is showing the loss was factually... But Willett didn't say some kind of causation. It said own causation. And you would have us to read that to mean on some kinds of causation, but not the kind that's going to count on remand. Your Honor, I would like to mean that it's plaintiff's burden to show breach and a related loss, which is causation. Right? The content of this proxy... I'm going to interrupt you before you finish. I think I'm sensing some tough sledding anyway on that issue. I wonder why you've connected the prudent choice standard to your burden of proof argument. Aren't those different? You made those in one area, but it seems to me that one is about the burden and one is about a way that you either meet or overcome that burden. They're related because the no prudent fiduciary standard would make no sense, right? If plaintiffs don't have the burden, then it certainly makes no sense to say that plaintiffs must prove that no prudent fiduciary would have done the same thing. But you're right, Your Honor, that they are distinct issues because we could still have the burden and I would still argue that the no prudent fiduciary standard is an inappropriate standard, one that has not been adopted by any circuit court of appeals. So let me quickly make that argument. Untethered from the burden argument. The question really is what the hypothetical prudent fiduciary would do. And if the burden is on us, it's the question of what a hypothetical prudent fiduciary would not do. At the end of the day, the real question is, are these prudent investments, right? And saying no prudent fiduciary ratchets up the standard to an area that's almost impossible for plaintiffs to obtain. Thank you. Mr. Martinez. Good morning, Your Honors. And may it please the Court, I'm Alan Martinez for the Home Depot defendants. Home Depot chose prudent investments tracking similar choices by dozens of other Fortune 500 companies and it paid reasonable fees to its advisors. ERISA doesn't let plaintiffs use hindsight and apples to orange comparators to second guess reasonable fiduciary choices. A lot of big institutions invested in mortgage-backed securities, right? Was that prudent? In retrospect, no. I think we're not making the argument that just because a lot of people invest in something that necessarily automatically proves that it's a reasonable investment. But I think the case law suggests that in a situation in which, as here, for example, with the BlackRock funds, BlackRock TDF funds are the second most popular investment choice and have been referred to by Judge Sutton in the Sixth Circuit as an example of a mainstream investment choice. And where all of the reasons that were given in our very detailed expert report show that those investment choices were, in fact, reasonable. We think that's exactly the kind of situation where there's good reason that so many people invested in them. Mortgage-backed securities, obviously, might be a different case. I think on the burden-shifting issue, Your Honors, it sounds like the Court's questions suggest that maybe looking at things our way, and we think that's appropriate, we think the right way to read Willett is that the operative sentence is that last sentence at the end, which talks about the ultimate burden of proof. The sentence that my friend on the other side referred to earlier is really a perhaps slightly unclear way of referring to the Celotex standard, whereby even at summary judgment, a defendant can come forward and point out that the plaintiff has the burden on an issue and hasn't satisfied that burden, and then the parties can fight it out at summary judgment. And I think that's the best way to reconcile those two different sentences in Willett, because otherwise the two different sentences would be completely at cross-purposes, and as Judge Grant pointed out, it would be highly unusual and wouldn't really make any sense for the reason Judge Hart pointed out, to have the burden on one side at trial, but the burden on the other side at summary judgment. That was not Frank Johnson's clearest opinion. Perhaps not, Your Honor. I do think they can be reasonably reconciled once you take into account sort of the Celotex overlay on this. But in an ideal judicial world, you wouldn't have to reconcile two sentences particularly that close, or two passages particularly that close in opinion. I don't think there are any. Let me ask you one thing, and this is a semi-layman's question. How is managed funds, and I've never seen an ERISA fund that wasn't a managed fund, that's basically market timing with a fiduciary overlay. Why didn't, and it's been proven time and again, that the market beats the timers over a period of time, which fiduciary funds is designed by and large for that. Why isn't a prudent rule that you ought to get the S&P 500, or the all market index, or small caps, large caps, and all that, put it in there and let the market have its say? Why? Why do we, I say we, why do the large folks, the folks who invest billions, insist on managing, active management, which over time is beaten by passive, quote, management? Well, I think in this case you should take a step back. What Home Depot's plan was offering was a range of options. And so it wasn't like they were just having some person in a room trying to pick individual stocks. They were giving fiduciaries a range of options. And I think the reason that the default option was the BlackRock TDF funds and not just putting all the money in the S&P 500, is that the S&P 500, if that's where you put all of your life savings forever, that actually is too risky an investment. Because as you get closer to retirement, there's a risk that if the market suddenly sharply goes down. Fine, fine, you shift. I mean, all the lifestyle timing, the ones that shift the investment shift into bonds. Right. That's fine. But you don't have to pick individual sets of them as opposed to whole market, slice of the whole market. And I think that's what the BlackRock TDFs are really trying to accomplish. What they're trying to say is, well, it's a fund of funds. So essentially the BlackRock TDF itself invests in other funds and it tries to create a balanced and diversified portfolio of funds that it's going to invest in. And the ratio of more risky to less risky investments changes over time as you get closer to retirement. So you're saying it's basically all a target day fund? The BlackRock fund's hard. The plaintiff pool gives fiduciaries options to put their money in other things. But one of the things that's very challenging in this case is that the plaintiffs are coming forward and trying to nitpick and second guess the choice of the BlackRock fund, which is just the mainstream fund that was chosen because they thought at one particular snapshot in time it didn't do as well as other possible investments. For example, they say that one of the reasons that we were imprudent is because we underperformed, the BlackRock TDF funds underperformed the S&P 500 even though they don't account for the fact that the S&P 500 was much more risky. And so it can't possibly be a fair comparator. So what's the snapshot in time that we're supposed to be looking at? I know you do criticize that they're cherry picking the time periods where perhaps the funds had dropped and ignoring the other point in time when the funds have risen. What snapshot should we be looking at? I think the moment in time that matters is the moment at which the investment decision is made, either to invest in a particular fund or allow fiduciaries, plan participants to invest in that fund, or the point in time in which you don't take that fund out of the mix. So you're not supposed to kind of look with hindsight after the fact and look back at how the investment did and then blame the fiduciary for not... So you're saying we can't ever? Like that if it was prudent when you purchased it and it's prudent when you sell it, as a court, we're not allowed to look at anything that's happening in between the investment decisions of the fiduciaries? I think the question on whether there is a breach of the duty of substantive prudence or whether there's loss causation with respect to a procedural prudence claim is was the investment objectively prudent or reasonable at the time it was made. And so everyone realizes, we all would love to have perfect knowledge when we're investing our savings in stocks and bonds and we all would love to be able to predict with perfect foresight how the market's going to go, but that's unreasonable to expect people to do that. And so instead, the point of ERISA is to require fiduciaries to basically be prudent at the time that they're making a particular decision. So in answer to my question, you're saying the court shouldn't look at anything between when you purchase it and when you sell it? I think that's basically right. When the claim is challenging a decision at time X, you shouldn't look at events after time X as sort of dispositive on the question of whether the decision at time X was prudent. And do you have any case law that supports that? I think it comes right out of the text of the statute, which is talking about your duty to make investments in a prudent way. And I think that that's the way that all the relevant case law in this context is sort of looking at this whole problem because it's recognizing the reality that people who are managing ERISA plans are just not going to be able to predict how the market's going to go later. So the key is, are you being reasonable now? How do you look at that question besides what everyone else is doing? It seems that a lot of the answer in your brief is look at all these other big companies who did this too, but I'm not sure that that's enough to satisfy it. So I think there are a couple of things. First of all, I think the fact that a lot of other big companies are doing it is a good indicator. I think there are other external validators. For example, with respect to the BlackRock TDF funds, you had the funds being sort of recommended. Morningstar within the class period gave it a gold star rating in 2019. Morningstar is obviously an external expert trying to evaluate this. The Aon Financial Advisors were recommending the stock as a buy throughout the class period. So that's another external validation. But then I think you can also look at the particular investment choices that are embedded within the fund and the judgment calls that were made. So again, to take the BlackRock fund as an example, BlackRock TDFs were investing in other funds and they were coming up with a glide path that they thought was reasonable and an allocation of assets within that glide path that were reasonable. So you would maybe look at the individual components of the BlackRock TDF funds. And I think the best statement of this, if you really want to get in the weeds, the Wormer Expert Report has 46 pages of extremely detailed analysis of why each of the judgment calls that BlackRock made when putting together the TDFs were reasonable. So I know the argument is that your client made reasonable choices, but let's say that the fund had gone down 25% the first year and it was like, oh, well, we think it's good, we'll see it through. And then another 25% the next year, et cetera, et cetera, et cetera. Surely at some point there's a fiduciary obligation to cut things off. I think you would not be then sort of second-guessing the original decision, but you might be second-guessing a decision to keep a fund that is doing terribly forever and ever and losing 25% a year. I think that would be a slightly different case. And I think the fact that the past performance has gone down is certainly a factor that can be considered. Why just a slightly different case? You're arguing for an extreme, lose down to $1. From $30 million. And that's a slightly different case. And if it was okay to buy it, and at $1, it's sure good to sell it. That's all we look at. I think if you had given me that hypothetical, I might've answered it differently. And I would say that- Well, where between $1 and 30 million, where do you end up? I think what you can't, it's hard to answer that question with precision, but I think the principle that would inform the answer is, number one, you have to look at the moment that the decision is being made, and you have to assess reasonableness. And number two, I think your point from earlier, Judge Carnes, is exactly right, is that we can't expect the risk of fiduciaries to be market timers. And so if the fund goes down, not 25%, not 99%, but if it goes down a little bit, looking back on a three to five year window, that doesn't automatically create a duty to sell. I thought the answer to my question, which I anticipated and kind of almost didn't ask it for that reason, is every decision makes market timing. If you don't sell when it's lost 25%, you're timing the market to stay in. If you do sell when it's lost 80%, you're timing the market to keep going down. That's your prediction. I think what I would just say is that when the mere fact that a stock goes down in the last year or last two years, it doesn't create a duty to sell it. And I think one of the fundamental problems in this case is that all the arguments on the other side rest on the expert report of Professor Laffer. And what Professor Laffer says very candidly in his rebuttal report, his reply report, is that in his view, it's objectively imprudent to maintain an investment that has below median performance. And so if you're in the bottom half of all investments, it's objectively imprudent. He would say, and therefore you have to sell. And that's sort of like misunderstanding of ERISA law informs all of his judgments that it was improper for us to hold investments even though in one three to five year look back period, those investments were below the median. So how can a plaintiff meet the necessary standard, right? How can you, since it all is market timing and who knows and judgments, how can a plaintiff actually show that the investment choices were illegal under ERISA? Well, I think if the plaintiff were to show that the choices that were made were putting money in outlier funds that were doing something very different from what everyone else was doing, that would be one way. I think if the investments were being put into funds that all the experts, third party experts that were evaluating these funds, they were saying, these are sell recommendations, do not put your money here, zero stars. I think that would be another indicator. And I think if you did the fine grained analysis of the judgment calls that that fund was making, for example, if you had a TDF fund that was invested entirely in the S&P 500, it would just be obviously too risky for a fund that's designed to provide a nest egg that's gonna last through retirement. So I think you would have to do that fine grained analysis. It's exactly the kind of analysis that our expert, Professor Wormer did in his 46 page analysis of the BlackRock TDFs. And it's exactly the analysis that's missing from Professor Laffer's six page, very cursory analysis of those same TDFs. And if you look at the Laffer analysis and you read those six pages, it will not take long. His basic point is just that it underperformed relative to other benchmarks. And one of the key benchmarks he points to is the S&P 500, as though underperformance of the S&P 500 is like evidence that there's an ERISA violation and that someone has lost funds and that an objectively prudent investor was acting unreasonably because they didn't just put all the money in big cap U.S. equity, big cap U.S. equity fund. That's not how ERISA works. That doesn't make sense. And so the judgments that were made here were reasonable at every step in the way. They were in the mainstream. Of course, you're just like you and I with our investment accounts. We always want the stocks to go up and sometimes they don't do what we want them to do. But that doesn't mean that it's the ERISA fiduciary's fault or that someone can bring an ERISA claim for tens of millions or hundreds of millions of dollars after the fact trying to second guess the decisions of a fiduciary. So these choices were mainstream, prudent, and reasonable. The last thing I'll say just in my last 20 seconds or so is Judge Grant, you flagged that the burden shifting issue is important, but there's also the issue of what the substantive standard for loss causation is. I just think that the best place to look for that standard is in Justice Scalia's concurring opinion, which is really fleshed out at great length and very thoughtfully by Judge Wilkinson in his dissent in the Tatum case, where he was really explaining why the objectively prudent test for loss causation really means that there's a range of reasonable judgments. And if you're within that range, then the judgment call is reasonable, it's prudent, there's no ERISA violation. The Tatum majority, as interpreted by my friends on the other side and as articulated here, would basically say that you are acting imprudently whenever you make an investment that is not like the most likely choice among reasonable choices. So you can be acting imprudently even though you make a reasonable investment that's within the range of reasonable judgments. And the Supreme Court in Hughes has made clear that the range of reasonable judgments approach embraced by Judge Wilkinson and Justice Scalia is the right approach. So with that, I ask you to affirm. Thank you, Mr. Martinez. Mr. Tracy, you have four minutes. Thank you, Your Honors. Putting aside the question of burden shifting, the key question for this Court is whether there were disputes about whether the funds were good investments and whether the fees were reasonable. And the record shows there are clearly disputes about this. On the fund, Dr. Arthur Laffer, an experienced economist and fiduciary in the field, looked at each of the investments, evaluated them, and determined a reasonable prudent fiduciary would have removed the investments. All the funds underperformed. Their benchmarks and peers on a three- and five-year basis, some performing worse than 90% of their peers, including BlackRock. They underperformed the very— they also underperformed the very objectives the plan set for them. And there were other indicators of poor quality on the funds, like other plans leaving the funds. At the relevant time period here in 2013, there was a massive outflow from BlackRock. BlackRock lost 50% of its clients in this fund between 2012 and 2015. So if you're looking at what other people were doing, what other fiduciaries were doing, you'll see that BlackRock was disfavored at this time because of its poor performance. Do you think any time in a case like this, there are expert reports that reach different conclusions that needs to go to a jury? I think if there are many expert reports where there are different conclusions about whether these funds were prudent, then that does create a dispute of fact that requires a trial, yes. Do you think parties find it hard on either side to shop for experts that are likely to reach a certain conclusion? I think if there is an Ipsit-Dixit opinion, then that opinion should get excluded on a Daubert motion. Here, when Judge Ray heard the oral arguments for the Daubert motions, at the hearing, Judge Ray denied the Daubert motion as to Dr. Laffer, finding him so obviously qualified that his opinion should be admitted at the hearing. So whatever, there may be circumstances where there are hired guns who provide Ipsit-Dixit opinions, but that's not this case. Your Honor, now on the fees, similar issues, there are disputes of fact. Plaintiff's expert, who is experienced in the field, said that the fees that financial agents and alike financial advisors were charging to participants were not reasonable after reviewing all the data on them. Other providers in this space undisputably charged less than what financial agents and alike financial advisors were charging Home Depot. And we know that most similarly sized plans indisputably paid less for financial engines and alike financial advisors' same services. But Home Depot would counter and say that we continued to negotiate and continued to get fee reductions over the course of working with these investment advisors. Your Honor, those arguments would go to the question of whether they breached their duties, and the court found disputes of fact as to breach and found that they weren't sufficiently negotiating and doing their due diligence on these fees over time. The question for the court here on proximate causation is really whether the fees were reasonable. And as I noted, there's lots of record evidence, including expert testimony, demonstrating disputes of fact as to that. Now, I want to address one point that the other side said in oral argument about when, and the court asked about, when do you look at the investment to determine if it's imprudent? What TIBL says, what the Supreme Court said in TIBL is that there is an ongoing duty. There's an ongoing duty to monitor investments. And so it's not just about what happens at the selection. It's about whether or not the fiduciaries engage in a prudent, diligent, skillful, ongoing monitoring process. And if there comes a point in time in that process where the funds become imprudent, where the fees are imprudent, the fiduciary has an obligation to remove that fund and to reduce those fees. Thank you. No, you've run through your time. Thank you. Thank you all. And we have your case under advisement. No, no, I mean, thank you. Take a hint. I just saw that. So I don't know if it's been rectified, I guess. I don't know. We'll find out. I'll let you all have a chance to get set up on the third and final case for today, but I'm going to go ahead and call it.